AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the
Central District of California

In the Matter of the Search of
The **SUBJECT PARCEL**, a Priority Mail parcel with Tracking #9506 1141 0372 2211 8721 61, addressed to Bella Freidson, 2765 W. 5th St., APT 9D, Brooklyn, NY 11230, with a return address of Snejana Bol, 14687 Deer Dr., Fontana, CA 92336

Case No. 2:22-MJ-03056

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, Darin White, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

(1) 21 U.S.C. §§ 331(a) and 333(a) [introducing or delivering for introduction into interstate commerce a misbranded or adulterated device]; and (2) 21 U.S.C. §§ 331(c) and 333(a) [receiving in interstate commerce a misbranded or adulterated device, and the delivery or proffered delivery thereof for pay or otherwise]

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

☐ Delayed notice of ________ days (*give exact ending date if more than 30 days*: ____________) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Darin White
*Applicant's signature*

Darin White, United States Postal Inspector

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.
Date: ________________

*Judge's signature*

City and state: Los Angeles, CA

Honorable Steve Kim, US Magistrate Judge

AUSA: Joseph Johns "/s/" 20220804

# **ATTACHMENT A**

## THE PREMISES OR PROPERTY TO BE SEARCHED

The property to be searched is the **SUBJECT PARCEL.** The **SUBJECT PARCEL** is described as a Priority Mail parcel with Tracking #9506 1141 0372 2211 8721 61. It is addressed to "Bella Freidson, 2765 W. 5th St., APT 9D, Brooklyn, NY 11230," with a return address of Snejana Bol, 14687 Deer Dr., Fontana, CA 92336." The **SUBJECT PARCEL** weighs approximately five pounds, six ounces. The **SUBJECT PARCEL** is in custody of the USPIS.

# **ATTACHMENT B**

## ITEMS TO BE SEIZED

The items to be seized from the **SUBJECT PARCEL** are evidence of the crimes of the SUBJECT OFFENSES, in violation of 21 U.S.C. §§ 331(a), (c), and 333(a)(1), (2), and described as follows:

1. Any foreign, unapproved medical products and/or otherwise adulterated and/or misbranded devices, including, but not limited to, Restylane Hyaluronic Acid-based injectable products, Teosyal Hyaluronic Acid-based injectable products, Filorga NCTF Hyaluronic Acid-based injectable products, and Profhilo Hyaluronic Acid-based injectable products;

2. All purchase orders, shipping records, invoices, packaging materials, labels, inserts, and directions for use for foreign, unapproved medical products; and

3. Any notes, correspondence, or other documents reflecting communications between the shipper and addressee that are located within the **SUBJECT PARCEL.**

# AFFIDAVIT

I, Darin M. White, being duly sworn, declare and state as follows:

## I. INTRODUCTION

1. I am a Postal Inspector ("PI") with the United States Postal Inspector Service ("USPIS"), and have been so employed since March 2008. I am currently assigned to the San Diego Mail Fraud Team. During my tenure as a PI my duties have included investigating individuals who use the U.S. Mails to transport controlled substances and investigating individuals who use the U.S. mails to transport suspicious substances and/or items. Prior to joining the USPIS, I was an investigator with the Drug Enforcement Administration ("DEA") for approximately five years. I have completed two, 12-week basic training academies for USPIS and DEA, respectively, where I completed training in investigative techniques related to the criminal use of mail and narcotics. In my career I have been involved in numerous arrests and have conducted numerous investigations of narcotics and dangerous substance-related crimes. I have participated in several court-authorized searches of residences, vehicles, and parcels.

## II. PURPOSE OF AFFIDAVIT

2. This affidavit is made in support of a search warrant for the following parcel: the **SUBJECT PARCEL** is a Priority Mail parcel with Tracking # 9506 1141 0372 2211 8721 61. It is addressed to "Bella Freidson, 2765 W. 5th St., APT 9D, Brooklyn, NY 11230," with a return address of Snejana Bol, 14687 Deer Dr.,

Fontana, CA 92336." The **SUBJECT PARCEL** weighs approximately five pounds, six ounces. The **SUBJECT PARCEL** is in custody of the USPIS.

3. Based on the information below, there is probable cause to believe the **SUBJECT PARCEL** described in Attachment A, contains the items to be seized described in Attachment B, which are the evidence, fruits, and instrumentalities of the following violations: (1) 21 U.S.C. §§ 331(a) and 333(a) (introducing or delivering for introduction into interstate commerce a misbranded or adulterated device; and (2) 21 U.S.C. §§ 331(c) and 333(a) (receiving in interstate commerce a misbranded or adulterated device, and the delivery or proffered delivery thereof for pay or otherwise) (the "Subject Offenses")].

4. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only, and all dates and times are on or about those indicated.

## III. THE LEGAL FRAMEWORK

### A. The Federal Food, Drug, and Cosmetic Act

5. The United States Food and Drug Administration ("FDA") is the federal agency responsible for protecting the health and

safety of the American public by ensuring, among other things, that medical devices are safe and effective for their intended uses and bear labeling that contains true and accurate information. The FDA's responsibilities include regulating the manufacture and distribution of medical devices shipped or received in interstate commerce, as well as the labeling of such medical devices. The FDA carries out its responsibilities by enforcing the FDCA and other pertinent laws and regulations.

6. The FDCA defines a medical device as, among other things, "an instrument, apparatus, implement, machine, contrivance, implant, in vitro reagent, or other similar or related article, including any component, part, or accessory, which is . . . intended for use in the diagnosis of disease or other conditions, or in the cure, mitigation, treatment, or prevention of disease, in man or other animals, or intended to affect the structure or function of the body of man or other animals, and which does not achieve its primary intended purposes through chemical action within or on the body of man or other animals and which is not dependent upon being metabolized for the achievement of its primary intended purposes." 21 U.S.C. §§ 321(h)(2), 321(h)(3).

7. Under the FDCA, medical devices are classified into one of three categories: Class I (lowest risk), II, or III (highest risk). 21 U.S.C. § 360c. A device's class determines the type of regulatory controls to which it is subject and any process it must complete prior to marketing. With the exception of certain devices that are exempt (by statute or regulation)

from any premarket review, all "new" devices (those which were not in existence when the device amendments were passed in 1976) that come on the market are automatically classified into Class III as a matter of law. 21 U.S.C. § 360c(f)(1). In order to change that de facto status, a sponsor would need to obtain FDA's determination that the device can be marketed as a Class I or II device. In any circumstance, all non-exempt devices require either approval or clearance by FDA before being marketed. 21 U.S.C. § 360e(a).

8. A prescription device is a device which, because of its potential for harmful effects, methods of use, or the collateral measures necessary to its use, is not safe for use except under the supervision of a practitioner licensed by law to direct the use of such device. 21 C.F.R. § 801.109.

9. A device is "adulterated" if, among other things, it is a Class III device pursuant to 21 U.S.C. §360c(f), and was required under 21 U.S.C. §360e(a) to have in effect an approved Pre-Market Application for Approval, and does not have such an approval in effect. 21 U.S.C. § 351(f).

10. Under the FDCA, devices are deemed to be "misbranded" unless their labeling bears adequate directions for use. 21 U.S.C. § 352(f)(1). Under regulations promulgated by the FDA, "adequate directions for use" is defined as directions under which a layman can safely use a device for its intended use. 21 C.F.R. § 801.5.

11. Prescription devices by their very nature are safe for use only under the supervision of a licensed practitioner. See

21 C.F.R. § 801.109. Adequate directions for use, therefore, cannot be written for prescription drugs and devices. To allow for the lawful movement of prescription drugs and devices in interstate commerce, FDA regulations exempt prescription devices from the adequate-directions-for-use requirement, but only if certain conditions are met. See 21 C.F.R. § 801.109.

12. One such condition requires that the prescription device is in the possession of: (a) a person, or his agents or employees, regularly and lawfully engaged in the manufacture, transportation, storage, or wholesale or retail distribution of prescription devices; or (b) a practitioner licensed by law to administer, use, prescribe, and/or order such prescription device. See 21 C.F.R. § 801.109(a)(1)(i) and (ii).

13. Another such condition requires that the prescription device be dispensed or sold only upon the valid prescription of a licensed practitioner. See 21 C.F.R. § 801.109(a)(2).

14. For prescription devices, another condition for exemption from the adequate directions for use requirement is that the prescription device's label bear the statement: "Caution: Federal law restricts this device to sale by or on the order of a physician/dentist/veterinarian." 21 C.F.R. § 801.109(b)(1).

15. Under the FDCA, the doing or causing of the following acts is prohibited:

a. Introducing or delivering for introduction into interstate commerce a misbranded or adulterated device, 21 U.S.C. § 331(a); and

b. Receiving in interstate commerce a misbranded or adulterated device, and the delivery or proffered delivery thereof for pay or otherwise, 21 U.S.C. § 331(c).

16. The FDCA defines interstate commerce as "(1) commerce between any State or Territory and any place outside thereof, and (2) commerce within the District of Columbia or within any other territory not organized with a legislative body." 21 U.S.C. § 321(b).

17. Any person who violates the prohibitions of 21 U.S.C. § 331 of the FDCA commits a misdemeanor, regardless of any mens rea, punishable by a maximum of imprisonment for one year. 21 U.S.C. § 333(a)(1). If committed with the intent to defraud or mislead a customer or the FDA itself, the violation constitutes a felony and is punishable by up to three years of imprisonment. 21 U.S.C. § 333(a)(2).

**Foreign Market Devices**

18. Foreign market prescription devices, also known as foreign, unapproved medical products ("FUMP"), will almost always be "adulterated" under the FDCA because they will differ from the FDA-approved versions, including that the foreign market devices may have different labeling (including different warnings and indications for use) and may be manufactured somewhere other than the location approved during the U.S. approval process.

19. Likewise, foreign-market versions of FDA-approved prescription devices will almost always be "misbranded" under the FDCA because they often do not meet the exemption from the

FDCA's requirement that the drug's labeling bear adequate directions for use. More specifically, the label for the foreign market version of the prescription device generally will not contain the statement: "Caution: Federal law restricts this device to sale by or on the order of a physician/dentist/veterinarian," which is required for the exemption in 21 C.F.R. § 801.109 to apply.

20. Foreign-market devices generally are less expensive than the FDA-approved version.

**B. The Medical Devices Involved in this Investigation**

21. On December 12, 2003, Q-Med Ab, a Swedish corporation, obtained FDA approval for their Pre-Market Application ("PMA") for Restylane Injectable Gel, a hyaluronic acid-based device they manufactured, for injection into the mid to deep dermis for correction of moderate to severe facial wrinkles and folds (such as nasiolabial folds). Between that time and March 2020, seven more PMAs were approved for injectable gel devices for various indications using the trade names Restylane®, Restylane® L, Restylane® Silk, Restylane® Lyft with Lidocaine, Restylane® Refyne, Restylane® Defyne, and Restylane® Kysse. All approvals restricted use of the devices to prescription use in accordance with 21 C.F.R. § 801.109. In 2012, Galderma Laboratories, L.P. acquired Q-Med as a wholly-owned subsidiary; in 2014, Galderma acquired the sole rights to distribute FDA-approved Restylane® injectable gel devices in the United States. Galderma also distributes Restylane® injectable gel devices in foreign markets

without the FDA-approved labeling that is required for U.S. distribution.

a. As indicated in the Statement of Probable Cause below, the Restylane®-branded products shipped to Snejana Bol and seized by law enforcement agents in this investigation are FUMP products and deemed to be both misbranded and adulterated.

22. Teoxane S.A., a Swiss manufacturer, markets and distributes injectable hyaluronic acid-based gel devices for various indications in European and other foreign countries using the trade name Teosyal®. Teosyal®-brand devices consist of an injectable hyaluronic acid-based gel that acts as a "filler" to temporarily add volume to the skin, especially around the nose and mouth. Because of the method of action of these products in the human body for their intended uses, they would be regulated as Class III medical devices under the FDCA. Teoxane S.A. has not received FDA approval to market or distribute Teosyal® medical devices in the United States.

a. As a consequence, with exceptions not relevant here, any Teosyal®-brand devices imported into, distributed, or sold within the United States constitute misbranded and adulterated Class III medical devices.

23. IBSA, a Swiss manufacturer, markets and distributes injectable hyaluronic acid-based gel devices for various indications in European and other foreign countries using the trade name Profhilo®. Profhilo®-brand devices consist of an injectable hyaluronic acid-based gel that acts as a "filler" to temporarily add volume to the skin, especially around the nose

and mouth. Because of the method of action of these products in the human body for their intended uses, they would be regulated as Class III medical devices under the FDCA. IBSA has not received FDA approval to market or distribute Profhilo® medical devices in the United States.

a. As a consequence, with exceptions not relevant here, any Profhilo®-brand devices imported into, distributed, or sold within the United States constitute misbranded and adulterated Class III medical devices.

24. Laboratoires Fillmed, a French manufacturer, markets and distributes injectable hyaluronic acid-based gel devices for various indications in European and other foreign countries using the trade name Filorga NCTF. Filorga®-brand devices consist of an injectable hyaluronic acid-based gel that acts as a "filler" to temporarily add volume to the skin, especially around the nose and mouth. Because of the method of action of these products in the human body for their intended uses, they would be regulated as Class III medical devices under the FDCA. Laboratoires Fillmed has not received FDA approval to market or distribute Filorga®-brand medical devices in the United States.

a. As a consequence, with exceptions not relevant here, any Filorga®-brand devices imported into, distributed, or sold within the United States constitute misbranded and adulterated Class III medical devices.

## IV. SUMMARY OF PROBABLE CAUSE

25. Based on the facts of this case and detailed below I believe there is probable cause to search and seize the **SUBJECT**

**PARCEL** for "Foreign, Unapproved Medical Products" ("FUMP"). The target in this case, Snejana Bol has repeatedly ignored warnings from United States Special Agents about FUMP products that she has been illegally importing into the United States. Based on a review of Bol's prior FUMP seizures by US Customs and a review of her own domestic mailing records, I believe she is still importing FUMP into the United States and then further illegally distributing FUMP via the United States Mail. I believe based on my training and experience and the facts in this case that FUMP will be located during a search of the **SUBJECT PARCEL.**

## V. STATEMENT OF PROBABLE CAUSE

26. Since approximately April 2022, I have been assisting the United States Food and Drug Administration, Office of Criminal Investigations ("FDA-OCI") Special Agent Paul Bartell with an investigation into Snejana Bol's importation, distribution, and sale of FUMP by use of the US Mails. During my involvement in this investigation, I have had the opportunity to review the interview and investigation reports prepared by Special Agent Bartell and other members of the FDA-OCI investigation team. I have also had the opportunity to discuss the reports and investigation with Special Agent Bartell and others. The investigation details below were obtained from my review of the investigation and interview reports, and from my discussions with the investigation team members.

27. On January 10, 2019, Special Agent Bartell received information from FDA-OCI Chicago Field Office Special Agent Michael Bugaj regarding two FUMP parcels that had been seized by

the United States Customs and Border Protection ("CBP") at the Illinois International Mail ("IMF") Facility. The parcels were addressed to Snejana Bol ("BOL"), 14687 Deer Dr., Fontana, CA 92336. The parcels contained 13 boxes of Teosyal® Hyaluronic Acid Injectables and six boxes of Filorga® NCTF Hyaluronic Acid vials. As noted above, these are Class III medical devices that have not been FDA-approved for U.S. entry, marketing, or distribution. The parcels' labeling indicated they had been shipped to BOL from the country of Denmark. The parcels containing the FUMP devices were transferred to Special Agent ("S/A") Paul Bartell in Los Angeles.

28. After receiving this information, S/A Bartell then researched BOL on the business networking site "linkedin.com," and learned that BOL is a registered nurse ("RN") at Arrowhead Regional Medical Center. S/A Bartell then contacted and spoke with a Human Resources Representative at the Arrowhead Regional Medical Center who confirmed BOL was, at that time, employed as a Registered Nurse.

29. On August 4, 2022, S/A Bartell accessed the online database for the California Board of Registered Nursing and determined that BOL is still listed as a licensed, registered nurse in the State of California.

30. On September 11, 2019, S/A Bartell received additional information from FDA-OCI S/A Bugaj about another parcel addressed to BOL which was intercepted by CBP at the IMF in Chicago, Illinois. The parcel contained ten boxes of Restylane,

addressed to BOL at 14687 Deer Dr., Fontana, CA 92336 from Direct Derma in Denmark.

31. As noted above, Restylane is a Class III medical device that may only be distributed within the United States by Galderma for prescription use in accordance with 21 C.F.R. §801.109. Although Galderma also distributes Restylane® injectable gel devices in foreign markets, these foreign-market devices do not have the required FDA-approved labeling for U.S. distribution.

32. On or about August 4, 2022, S/A Bartell provided me with the following information:

a. On August 4, 2022, Randy Russell, Director of Regulatory Affairs for Galderma, spoke with S/A Bartell via telephone. S/A Bartell and Mr. Russell reviewed photographs of the Restylane contained within packages that were seized by United States Customs and Border Protection and addressed to Snejana BOL at 14687 Deer Drive, Fontana, California 92336 from Direct Derma Supplies in Copenhagen, Denmark. The Restylane in these photographs, bearing lot number 011454, according to Mr. Russell, was not intended for United States markets, it was "foreign product". Mr. Russell commented that the United States product is labeled "Restylane LYFT with Lidocaine" while the non-United States packaging, simply states "Restylane LYFT Lidocaine"; the latter being what was purchased by BOL. Additionally, Mr. Russell stated that the products ordered by BOL contained numerous non-English statements on the labeling,

this also is an exemplar of foreign unapproved versions of Restylane.

b. As such, S/A Bartell advised me that the Restylane-branded dermal filler products shipped to BOL and intercepted by CBP in this investigation are FUMP, and therefore adulterated and misbranded Class III medical devices which are prohibited for importation, distribution, or sale within the United States.

33. On November 17, 2019, FDA-OCI S/A Reid Robbins contacted BOL at her residence to discuss the parcels containing unapproved injectable hyaluronic acid-based gel Class III medical devices and to inform her of the fact that the parcels had been seized by CBP. S/A Robbins informed BOL that ordering foreign, unapproved medical products, such as Teosyal and Filorga hyaluronic acid-based injectables is a violation of the FDCA. In response to this, BOL said, "I can order whatever I want." S/A Robbins reiterated to BOL that ordering foreign, unapproved medical products was a violation of FDCA, to which BOL replied, "I thought I could order whatever I want." S/A Robbins provided BOL with S/A Bartell's business card and instructed her to contact him for additional information.

34. On November 27, 2019, S/A Bartell received a voicemail from a woman identifying herself as BOL. The caller stated, "I order something from Denmark… and I thought I can order whatever I want for myself … so I'm confused … call me back my number is (909) 587-7800." S/A Bartell attempted to contact BOL at (909) 587-7800 and left voicemails four separate times during dates in

December 2019 and January 2020, and didn't receive a return call back from BOL.

35. On December 17, 2019, S/A Bartell received information that an additional five parcels containing an estimated 60 boxes of Restylane® Hyaluronic Acid-based injectables from Direct Derma Supplies in Denmark, addressed to BOL in Fontana, CA had been intercepted at the San Francisco, CA IMF by CBP.

36. On December 30, 2019, S/A Bartell received information of an additional three parcels from Direct Derma Supplies in Denmark, addressed to BOL in Fontana, CA, containing approximately 24 injection vials of Restylane® and Teosyal® brand Hyaluronic acid-based injectables were intercepted at the San Francisco, CA IMF by CBP.

37. In October 2020, S/A Bartell learned that CBP intercepted an additional parcel containing foreign, unapproved medical products addressed to BOL. S/A Bartell received custody of the parcel and reviewed the label and contents. The parcel was addressed to Snejana BOL, 14687 Deer Dr, 92336, Fontana, CA. The sender was listed as Direct Derma Supplies located in Denmark. The parcel contained seven boxes of Profhilo-brand Hyaluronic acid-based injectables in 2 milliliter vials. As noted above, these are Class III medical devices that have not been approved for U.S. marketing or distribution. As such, with exceptions not relevant here, the Profhilo-brand Hyaluronic acid-based injectables are both adulterated and misbranded. The packaging material showed BOL paid 650 euros for the injectables which is approximately $655.00 USD in today's exchange rate.

38. On March 1, 2021, S/A Bartell contacted BOL at her telephone number (909) 580-1000. BOL admitted to S/A Bartell that she recalled being contacted by him in 2019 and speaking with S/A Robbins. BOL claimed she thought the recent products she was purchasing were outside of the scope of products discussed with S/A Robbins in 2019 because she was only trying to make her own creams to use on herself. BOL agreed to meet with S/A Bartell to discuss the issue in more detail.

39. On March 9, 2021, BOL met with S/A Bartell and FDA S/A Michael Landon at the FDA Los Angeles Field Office. BOL told agents that all her purchases of foreign, unapproved medical products were for personal use and that she had "a lot of friends in Russia . . . who are doctors . . . so I know this is legit."

40. On or about August 4, 2022, S/A Bartell provided me with the following information:

a. He has conducted multiple reviews and analyses of BOL's financial, credit card, and banking records;

b. Those records indicate that between the dates of September 7, 2018, and July 3, 2022, BOL received approximately $301,050.22 of "Zelle" digital monetary transfers from 98 individuals and businesses;

c. Those records also show that between November 27, 2018, and December 16, 2021, a total of approximately $267,741 in charges were made to credit cards associated with BOL for the purchase of products from Direct Derma in Denmark;

d. It is presumed that these credit card charges are associated with BOL’s illegal purchase and importation of adulterated and misbranded FUMP dermal filler products; and

e. Direct Derma is not a legal source of prescription drugs and devices imported, distributed, or sold in the United States.

41. In April 2022, I was contacted by S/A Bartell in regard to this investigation. S/A Bartell informed me of his prior contacts with BOL and the previous seizures of foreign, unapproved medical products addressed to BOL’s residence. S/A Bartell informed me he had reason to believe BOL was still obtaining the foreign, unapproved medical products and then re-distributing them through the US Mail to customers. During the investigation, S/A Bartell obtained BOL’s credit card purchase history showing numerous transactions at the Rancho Cucamonga Post Office. S/A Bartell provided me with the purchase details which showed 30 transactions from June 17, 2021, through March 25, 2022. I conducted a search of United States Postal Service databases and reviewed the 30 transactions at the Rancho Cucamonga Post Office. The transactions primarily accounted for shipment of parcels via Express Mail or Priority Mail to addresses in Brooklyn, New York. For the purposes of this affidavit a summary of the relevant transactions is detailed below:

a. On January 10, 2022, a subject later identified as BOL entered the Rancho Cucamonga Post Office located at 10950 Arrow Route, Rancho Cucamonga, CA 91729 and mailed Express Mail

parcel #EI202132945US. The parcel weighed 12 pounds, five ounces and BOL paid $141.65 to ship it. USPIS personnel obtained surveillance video of the transaction showing BOL completing the transaction. The parcel was shipped to 1685 Ocean Avenue, Apt 5N, Brooklyn, NY 11230.

42. On January 18, 2022, a subject later identified as BOL entered the Rancho Cucamonga Post Office located at 10950 Arrow Route, Rancho Cucamonga, CA 91729 and mailed Express Mail parcel #EJ921082605US. The parcel weighed 10 pounds, one ounce and BOL paid $132.40 to ship it. USPIS personnel obtained surveillance video of the transaction showing BOL completing the transaction. The parcel was shipped to 2775 W. 5th St. Apt 5G, Brooklyn, NY 11224.

43. On February 8, 2022, a subject later identified as BOL entered the Rancho Cucamonga Post Office located at 10950 Arrow Route, Rancho Cucamonga, CA 91729 and mailed Express Mail parcel #EJ921082490US. The parcel weighed 13 pounds and BOL paid $161.70 to ship it. USPIS personnel obtained surveillance video of the transaction showing BOL completing the transaction. The parcel was shipped to 2929 W. 31st St., Apt 1L2, Brooklyn, NY 11224.

44. On February 28, 2022, a subject later identified as BOL entered the Rancho Cucamonga Post Office located at 10950 Arrow Rte, Rancho Cucamonga, CA 91729 and mailed two Express Mail parcels #EI030463347US and #EI030463333US. The parcels weighed 10 lbs. 3 oz. and 13 lbs. respectively. BOL paid $281.75 to mail both parcels. USPIS personnel obtained

surveillance video of the transaction showing BOL completing the transaction. The parcels were both shipped to 2929 W. 31st St., Apt 1L2, Brooklyn, NY 11224.

45. On March 14, 2022, a subject later identified as BOL entered the Rancho Cucamonga Post Office located at 10950 Arrow Route, Rancho Cucamonga, CA 91729 and mailed Express Mail parcel #EJ921081596US. The parcel weighed six pounds, 15 ounces and BOL paid $106.95 to ship it. USPIS personnel obtained surveillance video of the transaction showing BOL completing the transaction. The parcel was shipped to 2765 W. 5th St. Apt 9D, Brooklyn, NY 11224.

46. On March 25, 2022, a subject later identified as BOL entered the Rancho Cucamonga Post Office located at 10950 Arrow Route, Rancho Cucamonga, CA 91729 and mailed two Express Mail parcels #EJ729364451US and #EJ921082512. The parcels weighed nine pounds, six ounces, and seven pounds, five ounces, respectively. BOL also paid for a Priority Mail parcel #4201123595061141037320848326 which weighed two pounds, 14 ounces. BOL paid $273.70 for the mailing of all 3 items. USPIS personnel obtained surveillance video of the transaction showing BOL completing the transaction. The first Express Mail parcel was shipped to 2765 W. 5th St. Apt 9D, Brooklyn, NY 11224. The second Express Mail parcel was shipped to 1685 Ocean Ave., Apt 5N, Brooklyn, NY 11230. The Priority Mail parcel was shipped to 2955 Brighton 4th St., Apt 2B, Brooklyn, NY 11235.

47. Based on the review of previously referenced items shipped by BOL to 2765 W. 5th St., Apt 9D. Brooklyn, NY, 11224, I

was able to verify additional, more recently shipped items which were also addressed to "Bella Freidson." These included two Priority Mail parcels #9506114037321768622268 and #9506114103722145843305 which were mailed from the Rancho Cucamonga Posta Office on June 25, 2022, and May 25, 2022, respectively. The parcels listed a return name and address of Raymond Bol (BOL's husband) at 14687 Deer Drive, Fontana, CA 92336. Open-source data shows that Bella Freidson ("Freidson") is a "licensed esthetician" operating under a NY state license.

48. S/A Bartell has advised me that licensed estheticians frequently inject hyaluronic acid-based gels, such as Restylane, into their customers at commercial day or health spas under the direction of licensed physicians. Teosyal® and Filorga®-branded injectables are marketed and used in European and other foreign health spas in the same manner.

49. On July 31, 2022, I received information from USPIS databases that a Priority Mail parcel, tracking # 9506 1141 0372 2211 8721 61 (the **SUBJECT PARCEL**) shipped from Fontana, CA, for delivery at 2765 W. 5th St., Apt 9D. Brooklyn, NY, 11224. After the parcel arrived in Brooklyn, New York, I confirmed the parcel was addressed to "Bella Freidson" at 2765 W. 5th St., Apt 9D. Brooklyn, NY, 11224. The parcel listed a return address of Snejana BOL, 14687 Deer Dr., Fontana, CA 92336. The **SUBJECT PARCEL** weighs approximately five pounds, six ounces. The **SUBJECT PARCEL** was removed from the US mail stream and is currently held in the custody of the USPIS.

//

## VI. CONCLUSION

50. For all the reasons described above, there is probable cause to believe that the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of violations of (1) 21 U.S.C. §§ 331(a) and 333(a) (introducing or delivering for introduction into interstate commerce a misbranded or adulterated device, and (2) 21 U.S.C. §§ 331(c) and 333(a) (receiving in interstate commerce a misbranded or adulterated device, and the delivery or proffered delivery thereof for pay or otherwise) will be found within the **SUBJECT PARCEL**, as described in Attachment A.

________________________________
Darin M. White, Postal Inspector
United States Postal Inspection Service

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this ____ day of August, 2022.

____________________________________
HONORABLE STEVE KIM
UNITED STATES MAGISTRATE JUDGE